114 T.C. No. 1

UNITED STATES TAX COURT

SUZY'S ZOO®, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9423-98.                    Filed January 6, 2000.

P, a corporation the stock of which is owned 84 percent by S and 16 percent by two individuals unrelated to S, sells greeting cards and other paper products bearing an image of one or more of P's licensed cartoon characters. P's employees develop and draw the originals of all of the characters, and P transfers the original drawings to independent printing companies to reproduce images of the drawings onto P's paper products, which are made by the printers on P's behalf. The printers must reproduce the drawings and make the products in accordance with P's specifications, and they may not sell to a third party either P's original drawings, or reproductions thereof, or P's paper products.

<u>Held</u>: P produces, rather than resells, its paper products; thus, P does not qualify for the "small reseller" exception to the uniform capitalization (UNICAP) rules of sec. 263A, I.R.C.

Held, further, P is not excepted from the UNICAP rules by virtue of the artist exemption of sec. 263A(h), I.R.C.; none of P's shareholders owns "substantially all" of P's stock within the meaning of sec. 263A(h)(3)(D)(i)(I), I.R.C.

Held, further, the "year of change" for purposes of sec. 481, I.R.C., is the subject year (i.e., the year in which P's method of accounting is changed to conform to the UNICAP rules), rather than the first year to which the UNICAP rules apply.

Richard A. Shaw and Bruce M. O'Brien (specially recognized), for petitioner.

Christine V. Olsen, for respondent.

OPINION

LARO, Judge:  This case is before the Court fully stipulated.  See Rule 122.  Respondent determined a $131,077 deficiency in petitioner's Federal income tax for its taxable year ended June 30, 1994.  We decide primarily whether petitioner is subject to the uniform capitalization (UNICAP) rules of section 263A.  We hold it is.  We also decide whether the subject year is the "year of change" for purposes of section 481.  We hold it is.  Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the subject year, and Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

All facts were stipulated. The stipulation of facts and the exhibits submitted therewith are incorporated herein by this reference. Petitioner is a corporation with a taxable year ending on June 30. Its business is "social expression" through the original drawing of licensed cartoon characters and the dissemination of images of those drawings on certain paper products. Its principal place of business was in California when the petition was filed.

Eighty-four percent of petitioner's stock is owned by Suzy Spafford; the balance is owned by two individuals unrelated to her. Ms. Spafford is an artist who graduated from San Diego State University in 1967 with a bachelor's degree in fine arts. She obtained a teaching certificate in 1968 and taught high school art from 1968 through 1969. She began to develop cartoon characters in the 1960's, and she gradually developed petitioner's business from those characters. She incorporated petitioner's business in 1976, and she registered petitioner's name as a trademark with the Federal Government.

Petitioner sells paper products (primarily Christmas and greeting cards, but also secondary items such as stationery, calendars, recipe books, and invitations), each bearing a copy of one or more of its cartoon drawings. Petitioner's artistic work is all done at its headquarters in San Diego by Ms. Stafford and

two nonshareholder employees.  Ms. Spafford is petitioner's principal artist; she has personally drawn and painted most of petitioner's original cartoon characters and most of the scenes in which the characters appear.  The other two employees also draw original cartoon characters and scenes; their drawings are reviewed, modified (as necessary), and approved by Ms. Spafford. Ms. Spafford and the two employees together draw between 300 and 400 cartoon character/scenes a year, and each character/scene is numbered and licensed.

Petitioner offers for sale at its headquarters all currently available merchandise that bears an image of at least one of its cartoon characters.  Petitioner does not sell items that do not bear an image of at least one of its cartoon characters, and it does not sell its original cartoon drawings.  Petitioner's primary customers are card and gift shops and licensing partners, and most of its nonlicensing partner sales are by or through independent sales representatives, each of whom has a specified sales territory and each of whom earns a straight sales commission.  Sales representatives order petitioner's products directly from it, and they place the products in card and gift shops and the like.  Petitioner ships most of its inventory from its headquarters, where petitioner's employees generally package

the paper products for sale to the retailers on the basis of the sales representative's orders.

Petitioner uses several independent printing companies to print its products. Generally, petitioner sends an original cartoon drawing to a printer, and the printer photographs the drawing, performs the necessary color separations, and creates "proofs" of a particular paper product in accordance with specifications dictated by petitioner (e.g., the size of the card to be printed, the color of ink, and the grade of the card stock to be used in printing the card). The printer uses its own paper and its own ink, and it holds title to and bears the risk of loss of the supplies and printed goods until it ships the goods back to petitioner for petitioner to accept or reject. If petitioner rejects the goods, it informs the printer of changes which must be made to meet petitioner's specifications.

Printers do not print petitioner's paper products absent an order from it, and they are not allowed to sell petitioner's paper products or any of petitioner's original cartoon characters or reproductions thereof. Petitioner sends a purchase order to a printer indicating the number of a particular paper product that it wants printed, and the printer prints the approximate number of products ordered. In the case of cards, the printer prepares an invoice with artist's adjustments noted and ships the printed

items, per petitioner's instructions, to San Diego Bindery. Petitioner contracts with San Diego Bindery to cut the sheets of cards into individual cards and to fold each individual card, and San Diego Bindery bears the risk of loss if it damages any card during that process. San Diego Bindery ships the finished goods (with an invoice) to petitioner's headquarters, where petitioner stores all of its inventory.

In addition to selling products which bear at least one of its cartoon characters, petitioner enters into licensing agreements under which certain manufacturers are given the right to use one or more of petitioner's characters. Under a licensing agreement, petitioner generally charges the licensee a fee to use an original cartoon drawing and a royalty equal to a percentage of the licensed products sold. The licensees sell and distribute the products they create bearing images of petitioner's cartoon characters. Petitioner does not sell its licensees' products through either its independent sales representatives or through its catalogue; most of the licensees sell and distribute their products themselves. Petitioner does sell all of its licensees' products at its retail store.

Petitioner has never adjusted the value of its inventory to reflect section 263A. Petitioner's reported ending inventory on

June 30, 1994, was $1,556,404, and its absorption ratio for the year then ended would have been 42.87 percent.

Petitioner's gross receipts and other revenue for the subject year totaled $5,874,039. Of that amount, $5,241,830 was from sales,[1] $623,469 was from royalties from the licensing agreements, and $8,740 was from interest, discounts, and service charges. The gross receipts from sales were attributable to the following items:

| ITEMS | Receipts |
|---|---|
| Greeting cards | $2,034,561 |
| Boutique; e.g., party goods and balloons | 849,656 |
| Stationery, box notes & memo pads | 675,639 |
| Christmas products; e.g., cards | 621,082 |
| Books, calendars, & recipe cards | 315,034 |
| Wrap and tote | 193,101 |
| Invitations | 191,280 |
| Gift enclosures | 86,425 |
| Other items | 275,052 |
| Total | 5,241,830 |

For the 3 taxable years preceding the subject year, petitioner's gross receipts were $6,711,723, $6,772,772, and $5,898,638, respectively.

Respondent determined that petitioner is subject to the UNICAP rules. Respondent determined that petitioner's cost of goods sold for the subject year was overstated by $667,267 by

---

[1] The cost of goods attributable to those sales was $2,108,921. The only item reportedly included in that cost was "Purchases".

virtue of the fact that petitioner had failed to change its method of accounting to account for the UNICAP rules.

## Discussion

We decide primarily whether petitioner is subject to the UNICAP rules of section 263A.  The UNICAP rules, which generally require capitalization of expenses related to tangible property, were added to the Internal Revenue Code as part of section 803 of the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, 100 Stat. 2085, 2350.  As applicable herein, the UNICAP rules are effective with respect to taxable years beginning after December 31, 1986.  See TRA sec. 803(d)(2)(A).

Section 263A provides in relevant part:

SEC. 263A.  CAPITALIZATION AND INCLUSION IN INVENTORY COSTS OF CERTAIN EXPENSES.

(a) Nondeductibility of Certain Direct and Indirect Costs.--

(1) In general.--In the case of any property to which this section applies, any costs described in paragraph (2)--

(A) in the case of property which is inventory in the hands of the taxpayer, shall be included in inventory costs, and

(B) in the case of any other property, shall be capitalized.

(2) Allocable costs.--The costs described in this paragraph with respect to any property are –

(A) the direct costs of such property, and

(B) such property's proper share of those indirect costs (including taxes) part or all of which are allocable to such property.

Any cost which (but for this subsection) could not be taken into account in computing taxable income for any taxable year shall not be treated as a cost described in this paragraph.

(b) Property to Which Section Applies.--Except as otherwise provided in this section, this section shall apply to--

(1) Property produced by the taxpayer.--Real or tangible personal property produced by the taxpayer.

(2) Property acquired for resale.--

(A) In general.--Real or personal property described in section 1221(1) which is acquired by the taxpayer for resale.

(B) Exception for taxpayer with gross receipts of $10,000,000 or less.--Subparagraph (A) shall not apply to any personal property acquired during any taxable year by the taxpayer for resale if the average annual gross receipts of the taxpayer * * * for the 3-taxable year period ending with the taxable year preceding such taxable year do not exceed $10,000,000.

*    *    *    *    *    *    *

(g) Production.--For purposes of this section--

(1) In general.--The term "produce" includes construct, build, install, manufacture, develop, or improve.

(2) Treatment of property produced under contract for the taxpayer.--The taxpayer shall be treated as producing any property produced for the taxpayer under a contract with the taxpayer * * *.

(h) Exemption for Free Lance Authors, Photographers, and Artists.--

(1) In general.--Nothing in this section shall require the capitalization of any qualified creative expense.

(2) Qualified creative expense.--For purposes of this subsection, the term "qualified creative expense" means any expense--

(A) which is paid or incurred by an individual in the trade or business of such individual (other than as an employee) of being a writer, photographer, or artist, and

(B) which, without regard to this section, would be allowable as a deduction for the taxable year.

*     *     *     *     *     *     *

(3) Definitions.--For purposes of this subsection--

*     *     *     *     *     *     *

(C) Artist.--

(i) In general.--The term "artist" means any individual if the personal efforts of such individual create (or may

reasonably be expected to create) a picture, painting, sculpture, statue, etching, drawing, cartoon, graphic design, or original print edition.

(ii) Criteria.--In determining whether any expense is paid or incurred in the trade or business of being an artist, the following criteria shall be taken into account:

(I) The originality and uniqueness of the item created (or to be created).

(II) The predominance of aesthetic value over utilitarian value of the item created (or to be created).

(D) Treatment of certain corporations.--

(i) In general.--If--

(I) substantially all of the stock of a corporation is owned by a qualified employee-owner and members of his family (as defined in section 267(c)(4)), and

(II) the principal activity of such corporation is performance of personal services directly related to the activities of the qualified employee-owner and such services are substantially performed by the qualified employee-owner,

this subsection shall apply to any expense of such corporation which directly relates to the activities of such employee-owner in the same manner as if such expense were incurred by such employee-owner.

> (ii) Qualified employee-owner.--For purposes of this subparagraph, the term "qualified employee-owner" means any individual who is an employee-owner of the corporation (as defined in section 269A(b)(2)) and who is a writer, photographer, or artist.

Petitioner makes two arguments as to why it is not subject to the UNICAP rules. First, petitioner argues, it is excepted from those rules because it is a small reseller under section 263A(b)(2)(B).[2] Petitioner asserts that it engages in no manufacturing or production activity with respect to its paper products and that it resells those products after buying them from the producers thereof; namely, petitioner asserts, the printers. Second, petitioner argues, it is an artistic business that is exempt from the UNICAP rules by virtue of section 263A(h). Petitioner asserts that Ms. Spafford is a qualified employee-owner and that she owns substantially all of petitioner's stock. Petitioner asserts that Ms. Spafford's cartoon characters are original and unique and that her artwork is reproduced and disseminated through the paper products primarily for the character's aesthetic value.

Respondent argues that petitioner does not meet the reseller exception because it produces rather than resells its paper

---

[2] For purposes of sec. 263A, "resellers" are "retailers, wholesalers and other taxpayers that acquire property described in section 1221(1) for resale". Sec. 1.263A-1(a)(3)(iii), Income Tax Regs.

products.[3]  Respondent argues that petitioner does not qualify under section 263A(h).  Respondent asserts that Ms. Spafford does not own substantially all of petitioner's stock within the meaning of section 263A(h)(3)(D)(i)(I) and that petitioner's paper products are utilitarian rather than unique.

We agree with respondent that petitioner is subject to the UNICAP rules of section 263A.  As to petitioner's primary argument, namely, that it is a reseller and not the producer of its paper products, we disagree.  The facts of this case lead us to conclude that petitioner is and has been the only "owner" of its paper products up until the time that they are sold to its customers, and, thus, that petitioner is the only producer of those products for purposes of section 263A.  See sec. 1.263A-2(a)(1)(ii), Income Tax Regs. ("a taxpayer is not considered to be producing property unless the taxpayer is considered an owner of the property produced under federal income tax principles").  Petitioner's ownership interest in the paper products attaches at the first stage of their production; i.e., when the cartoon characters are developed and drawn.  Petitioner performs this step solely by itself, and this step, which requires the most skill, expertise, and creativity of any step in the production

---

[3] For purposes of sec. 263A, the term "produce" "includes * * * construct, build, install, manufacture, develop, improve, create, raise, or grow."  Sec. 1.263A-2(a)(1)(i), Income Tax Regs.

process, is critical and indispensable to the paper products' production. But for these characters, petitioner would not be able to sell its paper products in the form that it does. Petitioner also does not let anyone (e.g., a printer) sell, copy, or use any of its cartoon characters without its permission, and anyone who does so is in breach of the license that petitioner holds as to its characters.

Petitioner focuses on the fact that the producers actually develop the paper products and argues therefrom that the printers are the producers of its products. We disagree with this argument. The printer's reproduction of petitioner's characters onto ordinary paper is merely one small step in petitioner's process of exploiting its characters as sellable images, and the reproduction process is mechanical in nature in that it involves little independence on the printers' part and is subject to petitioner's control, close scrutiny, and approval. Petitioner personally selects the printers merely to reproduce the character's images in a specified manner onto standard sheets of plain paper. The printers cannot print the paper products without the cartoon images, and the finished products must conform to petitioner's specifications. Given the added fact that a printer does not acquire a proprietary interest in a cartoon drawing so that it may sell the drawing (or copy thereof) either separately or as part of a paper product, we conclude that

the printers are not producers because they never meet the necessary requirement of owning the paper products for Federal income tax purposes. See Charles Peckat Manufacturing Co. v. Jarecki, 196 F.2d 849 (7th Cir. 1952).[4]

Nor do we believe that a product such as petitioner's paper products may be considered within the meaning of section 263A (g)(2) when the product, in its finished form, requires such an extensive involvement on the part of the taxpayer vis-a-vis the purported producer, and the taxpayer has the exclusive right to sell the finished product. See id.; see also Polaroid Corp. v. United States, 235 F.2d 276 (1st Cir. 1956). Petitioner's transfer of the cartoon characters to the printers gave the printers only the bare right to possess the characters or reproductions thereof. It did not give the printers any right to sell the characters (or reproductions thereof) either alone or as

---

[4] The case of Charles Peckat Manufacturing Co. v. Jarecki, 196 F.2d 849 (7th Cir. 1952), is instructive to our analysis. There, the taxpayer owned a patent on a certain bracket for automobile visors and contracted with an independent machine shop to fabricate the bracket for it. The machine shop's entire output had to be sold to the taxpayer at a per-piece price, and the machine shop never had a proprietary interest in the bracket. The court held that the taxpayer manufactured the bracket for purposes of the Federal excise tax. The court focused on the control maintained by the taxpayer over the manufacturing process and observed that the fabricator "never had a proprietary interest in the completed product" because the bracket was subject to the patent that the taxpayer controlled. Id. at 852. The court stated: "it is not unusual in taxing statutes for the term 'manufacturer' to include one who has contracted with others to actually fabricate the product". Id. at 851.

part of a product such as petitioner's paper products. The ink and characterless paperstock which the printers sell to petitioner is sufficiently different from the character-filled paper products which petitioner sells to its customers so as to characterize the latter products as sold initially by petitioner, rather than as sold first by the printers to petitioner and then resold by petitioner to its customers. We also note that the approximately 60-percent gross profit percentage reported by petitioner for the subject year on the sale of its paper products leads directly to the conclusion that the printers charge petitioner solely for the paper, ink, and labor devoted to the paper products, rather than for the value of the paper products as items that are sold to petitioner for purposes of resale.

Petitioner focuses on the fact that the printers bear the risk of loss during the printing process. We do not find this fact dispositive as to who owns (and thus produces) the paper products. The identification of the owner of property for purposes of the UNICAP rules does not necessarily rest on who bears the risk of loss when the product is fabricated or assembled, or, for that matter, on who actually turns the screws or hammers the nails into the product. The owner of property must be identified from the facts and circumstances of the case,

see sec. 1.263A-2(a)(1)(ii), Income Tax Regs.,[5] and who bears the risk of loss is merely one factor to consider. That a good damaged during the printing process may cause a printer to suffer a loss for the ink and paper used on that good (and possibly the labor spent or value of the machinery used in applying the ink to the paper) does not necessarily mean that the printer was the damaged good's owner. As a matter of fact, a reasonable printer would most likely have factored into its price of the print job the projected expense for damaged or nonconforming goods.[6]

As to petitioner's second argument that it qualifies for section 263A(h)'s exemption for artists and other stated professionals, we also disagree. This exemption was not included in section 263A as originally enacted, but was added to that

---

[5] Sec. 1.263A-2(a)(1)(ii), Income Tax Regs., also provides that a taxpayer may be considered the owner of property produced even though it does not have legal title thereto.

[6] Petitioner also discusses at length sec. 1.263A-3(a)(3), Income Tax Regs. That section is inapplicable to the facts at hand. Sec. 1.263A-3(a)(3), Income Tax Regs., provides:

> (3) Resellers with property produced under contract. Generally, property produced for a taxpayer under a contract * * * is treated as property produced by the taxpayer. * * * However, a small reseller is not required to capitalize additional section 263A costs to personal property produced for it under contract with an unrelated person if the contract is entered into incident to the resale activities of the small reseller and the property is sold to its customers. * * *

That section is inapplicable because petitioner has no resale activities in that it is not a reseller of its paper products.

section by way of an amendment that was retroactive to the effective date of the TRA. See sec. 6026(a) of the Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. 100-647, 102 Stat. 3342, 3691. As amended by TAMRA, section 263A(h)(3)(D)(i) and (ii) allowed a "personal service corporation" (as defined in section 269A(b)) to qualify for section 263A(h)'s exemption if, among other requirements, "substantially all of * * * [its] stock * * * is owned by * * * [a qualified employee-owner] and members of his family". The House Ways and Means Committee stated in its report that "For this purpose, the term "substantially all" means 95 percent or more of the value of the corporation's stock". H. Rept. 100-795, at 531, 532 (1988). In the following year, Congress amended section 263A(h) a second time, again retroactive to the effective date of section 263A, to provide that any corporation (and not simply a personal service corporation) could qualify for section 263A(h)'s exemption if, among other requirements, "substantially all of * * * [its] stock * * * is owned by a qualified employee-owner and members of his family". See secs. 7816(d)(1) and 7817 of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, 2420.

We must apply the term "substantially all" to determine whether petitioner qualifies for the exemption set forth in section 263A(h). We generally apply statutory text in accordance

with its ordinary, everyday usage.  When the meaning of statutory text is "unescapably ambiguous", however, we may resort to the relevant legislative history to resolve that ambiguity.  <u>Garcia v. United States</u>, 469 U.S. 70, 76 n.3 (1984) (quoting <u>Schweumann Bros. v. Calvert Distillers Corp.</u>, 341 U.S. 384, 395 (1951) (Jackson, J., concurring)); see <u>Venture Funding, Ltd. v. Commissioner</u>, 110 T.C. 236, 241-242 (1998), affd. ___ F.3d ___ (6th Cir. 1999); see also <u>Albertson's, Inc. v. Commissioner</u>, 42 F.3d 537, 545 (9th Cir. 1994), affg. 95 T.C. 415 (1990).  Here, we believe that the term "substantially all" is "unescapably ambiguous", and, accordingly, we consult the term's legislative history for guidance as to its meaning.  As mentioned above, we find in the report of the House Ways and Means Committee that it clearly intended for that term to require that a qualified employee-owner and members of his family own "95 percent or more of the value of the corporation's stock".[7]  H. Rept. 100-795, <u>supra</u> at 531, 532 (1988).  We also find in the House conference report that the conference agreement followed the House bill as

---

[7] The legislative history to the TRA reveals that Congress also equated a 95-percent test with the term "substantially all" for purposes of sec. 448(d)(2), a provision included in the TRA as sec. 801(a).  See H. Conf. Rept. 99-841 (Vol. II) at II-287 (1986), 1986-3 C.B. (Vol. 4) 1, 287.  The legislative history to TAMRA reveals that the joint conferees to that Act knew that the term "substantially all" had been equated with a 95-percent requirement.  See H. Conf. Rept. 100-1104 (Vol. 2) at II-152 (1988), 1988-3 C.B. 473, 642.

amended by the Senate.[8]  See H. Conf. Rept. 100-1104 (Vol. II), at 145, 146 (1988), 1988-3 C.B. 473, 635-636.  Given the fact that none of petitioner's shareholders owns the requisite percentage of stock as set forth in the report of the House Ways and Means Committee, we hold that petitioner does not qualify for the exemption set forth in section 263A(h).[9]  We need not and do not address whether petitioner was otherwise disqualified for that exemption because, as asserted by respondent, its paper products are utilitarian in nature.

Having concluded that petitioner is subject to the UNICAP rules, we now turn to the remaining issue; i.e., the year in which section 481 requires that petitioner account for its change to the UNICAP rules.  Petitioner argues that TRA section 803(d)(2) requires that it account for this change in its taxable year ended June 30, 1988.  In relevant part, that section provides:

---

[8] None of the Senate's amendments are relevant for purposes of our discussion.

[9] Petitioner argues that the Court should apply a "facts and circumstances test" to determine whether Ms. Spafford owns "substantially all" of petitioner's stock for purposes of sec. 263A(h).  Petitioner notes that neither the text of sec. 263A nor the regulations thereunder have ever mentioned the 95 percent test referenced in the committee report and states that the "House Committee Report to Public Law 100-246 * * * suggested that a 95% interest would clearly satisfy the substantially all test."  Suffice it to say that the 95-percent test referenced in the committee report is more than a mere suggestion and that petitioner fails the 95-percent test because none of its shareholders owns the requisite percentage of stock.

(d) Effective date.--

    (1) In General.--Except as provided in this subsection, the amendments made by this section shall apply to costs incurred after December 31, 1986, in taxable years ending after such date.

    (2) Special Rule For Inventory Property.--In the case of any property which is inventory in the hands of the taxpayer--

        (A) IN GENERAL--The amendments made by this section shall apply to taxable years beginning after December 31, 1986.

\*   \*   \*   \*   \*   \*   \*

Petitioner focuses on the fact that section 803(d)(2)(A) of the TRA provides explicitly that the amendments contained therein "shall" apply to taxable years beginning in or after 1987 and asserts that this language means that the "year of change" for purposes of section 481 is the year for which it was required to change its method of accounting to conform to the UNICAP rules rather than the first year for which it actually made the change. Respondent argues that the "year of change" for purposes of section 481 is the year in which the change actually occurred; i.e., the subject year.

We agree with respondent. Section 481(a)(1) provides that where in computing a taxpayer's taxable income the computation is under a method of accounting different from the method under which the taxpayer's income for the preceding taxable year was computed, there shall be taken into account those adjustments

which are determined to be necessary solely by reason of the change in order to prevent an amount from being duplicated or omitted.  Section 481 was designed by Congress to prevent the duplication or omission of income or expense that may otherwise occur solely through a change in a method of accounting that is used by a taxpayer to compute his or her taxable income.  See Graff Chevrolet Co. v. Campbell, 343 F.2d 568, 572 (5th Cir. 1965); Pursell v. Commissioner, 38 T.C. 263, 271 (1962), affd. 315 F.2d 629 (3d Cir. 1963).  Congress designed section 481 broadly to allow the Commissioner to adjust income for a "year of the change" by increasing that year's income by any income that was earned in a "closed year" but went unreported due to the mechanics of the taxpayer's old accounting method.  See Graff Chevrolet Co. v. Campbell, supra at 572.  The year of change is the first taxable year in which taxable income is computed under a method of accounting that is different from the method of accounting that was used in the prior year.  See sec. 1.481-1(a)(1), Income Tax Regs.

In accordance with this firmly established law, the year of change in this case is the subject year; i.e., the first year in which petitioner's method of accounting was changed to reflect the UNICAP rules.  Petitioner attempts to distinguish this law by arguing that, as of its first taxable year beginning in 1987, TRA section 803(d)(2) changed its method of accounting to conform to

the UNICAP rules as an operation of law.[10]  We find that argument unpersuasive.  The fact of the matter is that, up until and including the subject year, petitioner used a method of accounting that did not reflect the UNICAP rules, and our holdings herein mean that petitioner must recompute its income for the subject year under a method of accounting that does take into account those rules.  See also sec. 1.263A-1T(e)(11), Temporary Income Tax Regs., 52 Fed. Reg. 10052, 10083-10084 (Mar. 30, 1987) ("Taxpayers who are required to change their method of accounting under this section and who fail to comply with the requirements of this paragraph (e)(11) [regarding an automatic

---

[10] Petitioner also notes that the Commissioner had previously examined some of its earlier taxable years that postdated the effective date of the UNICAP rules and that the Commissioner had never changed its method of accounting for those years to conform to those rules.  Petitioner suggests that the Commissioner now is estopped from making the sec. 481 adjustment for the subject year.  We find this suggestion unavailing.  The fact that the Commissioner had the opportunity to, but did not, change an improper method of accounting in an earlier year does not mean that he is estopped from making the change in the later year. See Knight-Ridder Newspapers Inc. v. United States, 743 F.2d 781 (11th Cir. 1984).  The doctrine of equitable estoppel does not bar the Commissioner from correcting a mistake of law, see Automobile Club v. Commissioner, 353 U.S. 180, 183 (1957); see also Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 61 (1995), and the cases cited therein, affd. 140 F.3d 240 (4th Cir. 1998), "even where a taxpayer may have relied to his detriment on the Commissioner's mistake", Dixon v. United States, 381 U.S. 68, 72-73 (1965).  The Commissioner may correct mistakes of law because "'Whoever deals with the government does so with notice that no agent can, by neglect or acquiescence, commit it to an erroneous interpretation of the law."' Graff v. Commissioner, 74 T.C. 743, 762 (1980) (quoting Schafer v. Helvering, 83 F.2d 317, 320 (D.C. Cir. 1936)), affd. 673 F.2d 784 (5th Cir. 1982).

change in method of accounting to comply with the UNICAP rules] shall be considered as using an improper method of accounting under the Code"). Because the subject year is the first taxable year in which taxable income is computed under a method of accounting that is different from the method of accounting used in the prior year, we agree with respondent that the subject year is the "year of change" for purposes of section 481. See also sec. 1.481-1(a)(1), Income Tax Regs.

All arguments not discussed herein are either irrelevant or without merit. To reflect concessions,

<u>Decision will be entered</u>

<u>under Rule 155.</u>